## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| MATTHEW V. EBBIGHAUSEN and KATHERINE EBBIGHAUSEN, | Civil No. 10-3120 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| JP MORGAN CHASE BANK, N.A., JOHN DOE, CREATIVE FUNDING CORPORATION, INC., JOANNE BRYANT, and FEDERAL DEPOSIT INSURANCE CORPORATION, *as receiver for Washington Mutual*, | |
| Defendants. | |

Carl E. Christensen, **CHRISTENSEN LAW OFFICE, PLLC**, 800 Washington Avenue North, Suite 704, Minneapolis, MN 55401, for plaintiffs.

Jennifer L. Olson and Matthew B. Seltzer, **LEONARD STREET AND DEINARD, PA**, 150 South 5th Street, Suite 2300, Minneapolis, MN 55402, for defendant JP Morgan Chase Bank, N.A.

Kelly S. Hadac, **MURNANE BRANDT, PA**, 30 East 7th Street, Suite 3200, St. Paul, MN 55101, for defendant Federal Deposit Insurance Corporation.

On July 26, 2007, Matthew V. Ebbighausen and Katherine Ebbighausen ("the Ebbighausens") entered into a mortgage loan transaction to refinance their home in Scott County, Minnesota. They eventually fell behind on their loan payments, and defendant JP Morgan Chase Bank, N.A. ("Chase") attempted to foreclose on the property. The

Ebbighausens bring this action against Chase, John Doe,[1] Creative Funding Corporation, Inc., Joanne Bryant, and the Federal Deposit Insurance Corporation ("the FDIC") as receiver for Washington Mutual ("WaMu") alleging claims for quiet title/declaratory relief, fraud/intentional misrepresentation, civil conspiracy to commit fraud, negligent misrepresentation, slander of title, individual liability/piercing the corporate veil, and violations of the Truth in Lending Act ("TILA").[2]   The Ebbighausens seek to rescind their loan and receive other relief because they allegedly received inadequate disclosures at closing pursuant to TILA.   They also seek relief because, they allege, Chase has wrongly attempted to foreclose on their home.   Although it is possible that Chase has wrongly attempted to foreclose, the Ebbighausens have not properly alleged that Chase has done so.   Similarly, although it is possible that the Ebbighausens have a valid TILA claim, the Ebbighausens have not properly alleged such a claim.   Accordingly, the Court will grant Chase and the FDIC's motions for summary judgment and will deny Plaintiffs' motion for default and summary judgment.

---

[1] Although John Doe is listed as a defendant, the Ebbighausens bring no claims against John Doe. (*See* Am. Compl., May 6, 2011, Docket No. 26.)  Accordingly, the Court will dismiss John Doe from this action.

[2] The Ebbighausens have abandoned Count VIII, alleging violations of the Real Estate Settlement Procedures Act ("RESPA").

## BACKGROUND

### I.   CLOSING AND CLOSING DOCUMENTS

Matthew Ebbighausen is a licensed real estate broker who owned a company involved in hundreds of residential real estate transactions.  (Third Decl. of Matthew B. Seltzer, Ex. B (Dep. of Matthew Ebbighausen ("Ebbighausen Dep.") 42, 46-47), June 21, 2012, Docket No. 71.)  On July 26, 2007, Matthew and Katherine Ebbighausen entered into a mortgage loan transaction to refinance their home.  (First Aff. of Matthew V. Ebbighausen ¶ 3, May 14, 2012, Docket No. 54.)  The closing of the loan took place at an office in Lakeville, Minnesota, that David Anderson, the closer of the loan, shared with the real estate brokerage that Matthew Ebbighausen owned.  (Third Seltzer Decl., Ex. A at 4; Ebbighausen Dep.  50.)  It appears that defendants Creative Funding Corporation, Inc., and Bryant had some involvement in the closing, but nowhere in the amended complaint is this precise role described.  Ebbighausen had a prior business relationship with Anderson because Anderson's title company has underwritten transactions handled by Ebbighausen's brokerage.  (Ebbighausen Dep. 49-51, 58.)

At the closing on July 26, the Ebbighausens agreed to borrow $885,500 from WaMu and, in return, agreed to grant WaMu a mortgage against their home.  (*See* First Ebbighausen Aff. ¶ 4, Exs. A-C.)  Matthew Ebbighausen signed the note for the property.  (*Id.*, Ex. A; Second Decl. of Matthew B. Seltzer, Ex. B at 9, May 29, 2012, Docket No. 58.)  The note obligated the Ebbighausens to make monthly payments and, if they failed to do so, stated that the lender was entitled to accelerate the debt and foreclose the mortgage. (First Ebbighausen Aff., Ex. A.)  The Ebbighausens both signed the mortgage,

which was recorded by WaMu in the office of the County Recorder of Scott County, Minnesota, on August 3, 2007. (*Id.*, Ex. B.) The mortgage identified the lender as "Washington Mutual Bank, FA." (*Id.*, Ex. B at 9.)[3]

In addition to the note and mortgage, the Ebbighausens signed other documents on July 26, including a Good Faith Estimate of Closing Costs. (Third Seltzer Decl., Ex. C.) This Good Faith Estimate identified a loan discount fee of $6,641.25 to be paid by the Ebbighausens. (*Id.*) This loan discount fee was also disclosed in a Borrower's Disbursement Authorization that Matthew Ebbighausen signed. (*Id.*, Ex. D.)

The Ebbighausens also signed a Truth in Lending Disclosure Statement ("TIL") on July 26 that outlined the terms of the loan as follows:

| | |
|---|---|
| Annual percentage rate: | 7.00005% |
| Finance charge: | $1,388,888.07 |
| Amount financed: | $ 871,045.71 |
| Total of payments: | $2,259,933.78 |

(Am. Compl., Ex. 4, May 6, 2011, Docket No. 26.) In addition, the Ebbighausens signed a "notice of right to cancel" document that day. (*Id.*, Ex. 10.) By signing this document, the Ebbighausens confirmed that they "each acknowledge[d] receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending

---

[3] A lender holds a promissory note and a mortgage. "[P]romissory notes and [mortgages] have been treated as two distinct documents that are legally intertwined." *Jackson v. Mortg. Elec. Registration Sys., Inc.*, 770 N.W.2d 487, 493 (Minn. 2009). A "mortgage" refers to the underlying security instrument or lender's interest in the land associated with a loan. *Id.* at 493-94. A "note" refers to the borrower's debt obligation to the lender. *Id.* "[L]oans are evidenced by a promissory note and secured by a [mortgage.]" *Id.* at 490.

- 4 -

Disclosure Statement." (*Id.*)[4]  Ebbighausen was aware through his work as a broker that loan closings include the right to rescind or cancel.  (Ebbighausen Dep. 48.)  He had also seen TILs before in the course of his work.  (*Id.*)

The Ebbighausens claim that they received no copies of the closing documents on July 26.  They currently allege that they only acquired copies of closing documents on October 31, 2008, after requesting them from the title company.  (*See* First Ebbighausen Aff. ¶ 5.)[5]  Matthew Ebbighausen testified at his deposition, however, that he did not receive anything at closing but may have received some documents the next day.  (Ebbighausen Dep. 59-60.)  The closer of the loan, Anderson, testified that he delivered the entire package of closing documents to the Ebbighausens shortly after the closing on July 26, possibly the day after closing.  (Third Seltzer Decl., Ex. A (Dep. of David Anderson ("Anderson Dep.") 23).)

## II.     HUD-1 SETTLEMENT STATEMENTS

Much of the Ebbighausens' case focuses on allegedly conflicting HUD-1 settlement statements related to their loan.  A HUD-1 settlement statement ("HUD-1") is a statement "setting forth settlement charges in connection with either the purchase or the refinancing" of a residential property.  24 C.F.R. § 3500.2(b).  Matthew Ebbighausen had seen HUD-1s in the past through his work as a broker.  (Ebbighausen Dep. 47.)

---

[4] This document did not list a precise date by which the Ebbighausens could cancel their loan, but it notified them that they could cancel within three business days of July 26, 2007.  (*Id.*)

[5] In 2009, the Ebbighausens also received copies of documents related to their loan and its closing from WaMu.  (*See* First Ebbighausen Aff. ¶¶ 6-7, Exs. E-F, H, N-O.)

The Ebbighausens have produced a HUD-1 dated "7/26/07 [at] 3:15 PM" ("the first HUD-1").  (First Ebbighausen Aff., Ex. H.)  The first HUD-1 shows the "[t]otal settlement charges" for the mortgage loan to be $10,882.14.[6]  (*Id.*)  It lists a "settlement" or closing date of July 26, 2007.  (*Id.*)

The Ebbighausens have also produced a HUD-1 with a time-stamp across the top that states "07/31/07 1:41 PM" ("the second HUD-1").[7]  (*See* First Ebbighausen Aff., Ex. F.)[8]  Because of this time stamp, the Ebbighausens claim that the document was created on July 31.  Although Chase claims that the document may have been created earlier, the Court will assume without deciding that the document was created on July 31.  This HUD-1 shows the "[t]otal settlement charges" to be $17,764.64.  (*Id.*)  The settlement costs were higher in the second HUD-1, primarily because they included a loan discount fee of $6,641.25 that was not listed on the first HUD-1.  (*Id.*)[9]  The second

---

[6] The Ebbighausens originally claimed that this document did not have a signature page, but they have now produced one dated July 26, 2007.  (*See* Am. Compl. ¶¶ 40 n.1, 43; Am. Compl., Ex. 11; First Ebbighausen Aff., Ex. H.)

[7] The Court notes that, in their complaint, the Ebbighausens gave different labels to the HUD-1 than are used in this order; for example, the Ebbighausens label the Third HUD-1 as the First HUD-1.  (*See* Am. Compl. ¶¶ 44, 46, 50.)

[8] The second HUD-1 was apparently generated in response to an e-mail that Anderson received from WaMu on July 31, 2007, asking for corrections on the first HUD-1.  (*See* First Aff. of Carl E. Christensen, Ex. V, May 14, 2012, Docket No. 55.)

[9] The second HUD-1 also listed a credit report fee of $36.25, a funding and review fee of $455, and a broker processing fee of $990.  The first HUD-1 had listed these amounts respectively as $15, $530, and $695.  Additionally, the second HUD-1 was corrected to show a $43 tax procurement to Washington Mutual, instead of LandAmerica.

HUD-1 lists the "settlement" or closing date to be July 28, 2007.  (*Id.*)[10]   The Ebbighausens claim that the second HUD-1 controlled the terms of the loan transaction and thus July 28 is when the loan truly "closed."[11]

## III.   AFFIDAVIT OF LOST NOTE

Sometime after the closing of the Ebbighausens' loan, the original note was lost. The Ebbighausens claim to have received a lost note affidavit from WaMu in 2009.  (*Id.* ¶¶ 6-7.)   This affidavit states that the promissory note in the amount of $885,500, executed by the Ebbighausens on July 28, 2007, was lost.  (*Id.*, Ex. N.)  It lists the correct loan number for the note.  (*Id.*; *see* Am. Compl., Ex. 1.)  This affidavit has certain blank fields, such as a field intended to include information about when the security instrument was recorded.  (First Ebbighausen Aff., Ex. N.)

WaMu also produced a "Lost Note Agreement and Indemnity," signed September 19, 2007, which acknowledges the loss of the original note and states – correctly – that the note was dated July 26, 2007.  (*See id.*, Ex. O; Am. Compl., Ex. 1.) This document states:

––––––––––––––

[10]  The Ebbighausens also received a third HUD-1 from WaMu in 2009 that was dated July 24, 2007, and listed the lender as ING Bank, rather than WaMu.  (*See* Am. Compl., Ex. 14.) It lists the settlement charges as $14,307.05.  (*Id.*)  This third HUD-1 does not appear to be directly relevant to the motions at issue.  All three settlement statements were allegedly part of the Ebbighausens' loan file, passed from WaMu to Chase.  (*See* Ebbighausen Aff. ¶¶ 6-7, Exs. F, H.)

[11]  The Ebbighausens also seem to suggest at times that the closing occurred on July 31.

LOST NOTE AGREEMENT AND INDEMNITY

In consideration of the purchase of the certain security instrument, dated July 26, 2007 in the principal sum of $885,500.00 executed by Matthew V Ebbighausen in favor of the undersigned, the original of which has been lost, the undersigned hereby agrees with any successor owner of said Note that it shall:

1.  Deliver said original Note, if found to such owner,

2.  Execute any documents or assurances, and take any other action with respect to said Note, as such owner shall reasonably require;

3.  Deliver to successor a certified copy of said lost note; and,

4.  If possible, obtain from said Borrower a fully executed duplicate original of said Note and submit same to successor as soon as it is available.

The undersigned further agrees to hold harmless and indemnify any successor owner from any and all damages, liability, expenses, losses, claims or suits of any nature whatsoever (including reasonable attorney's fees) incurred or suffered directly or indirectly by reason of the loss of said Note.

Executed at 2210 Enterprise Drive, Florence, SC 29501 on the September 19, 2007.

Washington Mutual Bank FA,
Tammy L Cantey, Assist. Vice President

Pay to the order of _____Without Recourse[,] Washington Mutual Bank[,] Cynthia A. Riley, Vice President

(First Ebbighausen Aff., Ex. O.)   With the last line, this lost note agreement and indemnity is "endorsed in the blank." (*Id.*)   The Ebbighausens claim that this

endorsement in the blank creates a question of material fact as to whether the loan was assigned from WaMu to a party other than Chase at some point in the past.[12]

## IV.    THE EBBIGHAUSENS' DEFAULT

The Ebbighausens' payments on their loan are only current through December 2008, and they have not made a payment since March 2010.  (Decl. of Montoya McGruder ¶ 10, Apr. 23, 2012, Docket No. 49.)  In addition, Chase has apparently paid the real estate taxes on the property for some time.  (Ebbighausen Dep. 63.)

## V.    SALE OF EBBIGHAUSENS' MORTGAGE AND LOAN

As noted above, WaMu originally owned the Ebbighausens' note and mortgage. On September 25, 2008, the Office of Thrift Supervision placed WaMu into FDIC receivership for liquidation. (First Aff. of Kelly S. Hadac, Ex. A, May 30, 2012, Docket No. 61; McGruder Decl., Ex. E.)  Pursuant to a Purchase and Assumption Agreement ("P&A agreement") executed on September 25, 2008, the FDIC sold the assets and certain liabilities of WaMu to Chase, including – Chase alleges – the Ebbighausens' loan and mortgage.  (*See* McGruder Decl. ¶ 4.)

---

[12] The Ebbighausens' payment history shows payments before and after the September 25, 2008 date of the Purchase and Assumption Agreement with the FDIC, described below. (Decl. of Montoya McGruder, Ex. D at 46, Apr. 23, 2012, Docket No. 49; Ebbighausen Dep. 67-68; Third Seltzer Decl., Ex. G at 87.)  Matthew Ebbighausen admitted that no one other than WaMu and Chase has ever contacted him about this loan or payment of it.  (Ebbighausen Dep. 61.)  Chase argues that no one other than WaMu or Chase has owned the loan because Ebbighausen has not paid nor been contacted by anyone regarding payment other than these two parties.

## VI.    RECORDING OF THE MORTGAGE

At some point, Chase claims that it submitted to Scott County an Affidavit of the FDIC affirming that Chase became the owner of all WaMu loans.  (Decl. of Janette L. Aalbers ¶¶ 2-3, Ex. A, Aug. 31, 2012, Docket No. 79.)   This document, from the Washington State Recorder, lists Chase as the owner of all "loans and loan commitments of Washington Mutual."  (*Id.*, Ex. A at 4.)   The form does not say anything about the Ebbighausens' property or mortgage.  Chase has produced no document establishing that it recorded the Ebbighausens' **mortgage** with Scott County.

## VII.    NOTICE OF FORECLOSURE

In April 2009, Chase filed a Notice of Pendency of Proceeding to Foreclose Mortgage ("Foreclosure Notice").  (First Ebbighausen Aff., Ex. P.)  In May 2009, Chase filed a Power of Attorney to Foreclose Mortgage.  (*Id.*, Ex. Q.)  This document states that the mortgagee is Washington Mutual Bank, FA and lists the date and place of filing of the mortgage as August 3, 2007, in Scott County.  (First Ebbighausen Aff., Ex. Q.)  Thus, this document seems to acknowledge that Chase had not, by that time, recorded the mortgage in its name.  The foreclosure sale of the Ebbighausen home has now been postponed twice.  (First Decl. of Matthew B. Seltzer, Ex. K, Apr. 23, 2012, Docket No. 50.)

## VIII.   ATTEMPT TO RESCIND

The Ebbighausens attempted to rescind their mortgage loan by sending notice to WaMu on April 10, 2010, and to Chase on June 8, 2010.  (First Ebbighausen Aff. ¶¶ 11-12, Exs. R-S.)  No party has honored the rescission request.  (*Id.* ¶ 13.)

## ANALYSIS

## I.        STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party demonstrates that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.       TILA

The Ebbighausens bring a claim for TILA rescission, pursuant to 15 U.S.C. § 1635, against Chase and the FDIC as receiver for WaMu.  This claim alleges that WaMu did not clearly and conspicuously disclose the Ebbighausens' right to rescind their loan or the material terms of the loan.  (Am. Compl. ¶¶ 84-98.)  The Court must

determine if a factual dispute exists regarding whether the Ebbighausens received the clear and conspicuous disclosures required by TILA.[13]

## A.   Disclosure of Material Terms

The Ebbighausens first argue that they are entitled to rescind their loan because they did not receive clear and conspicuous disclosure of the finance charge associated with their loan.  TILA's purposes are "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing . . . practices."  15 U.S.C. § 1601(a).  In accordance with these purposes, TILA "requires creditors to provide borrowers with clear and accurate disclosures of terms."  *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998).[14]  Specifically, if a consumer does not receive certain "material disclosures," the consumer has the right to rescind the transaction.  *See* 15 U.S.C. § 1635(a), (f); 12 C.F.R. § 226.23(a)(3).  Among these "material disclosures" are the finance charge.[15]  12 C.F.R. § 226.23(a)(3) n.48.  A "finance charge" is defined as "the cost of consumer credit as a

---

[13] Chase argues that the TILA claim fails because the Ebbighausens cannot tender.  The Court rejects this argument for the reasons outlined in *Trombley v. SunTrust Mortgage, Inc.*, Civil No. 10-3089, 2012 WL 3029645, at *6 (D. Minn. July 24, 2012).

[14] Even assuming that TILA does not require "perfect notice" of all terms, it does require "substantial, clear disclosure."  *See Peterson-Price v. U.S. Bank Nat'l Ass'n*, Civil No. 09-495, 2010 WL 1782188, at *5 (D. Minn. May 4, 2010) (quoting *Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12, 16 (1st Cir. 2007); *Smith v. Chapman*, 614 F.2d 968, 972 (5th Cir. 1980)).

[15] The "amount financed" is also a "material disclosure[]" and is defined at 15 U.S.C. § 1638(a).

dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." *Id.* § 226.4(a).  Examples of finance charges include "[p]oints, loan fees, assumption fees, finder's fees, and similar charges." *Id.* § 226.4(b)(3).  Thus, finance charges include loan discount fees like those inaccurately omitted from the Ebbighausens' first HUD-1.

As a preliminary matter, the Court notes that the Truth in Lending Disclosure Statement ("TIL"), created pursuant to TILA requirements and signed by the Ebbighausens on the day of closing, did not violate TILA or disclose materially inaccurate terms.   Indeed, the Ebbighausens have not argued that the TIL violated TILA.[16]

Instead, the Ebbighausens' complaint focuses on inaccuracies in the first HUD-1. (*See* Am. Compl. ¶ 92.)  Specifically, the complaint alleges that the Ebbighausens are entitled to rescind their loan "because Washington Mutual or its successors in interest had initiated a foreclosure against the Ebbighausens and the [First] HUD-1 statement

---

[16] As explained in detail by Chase in its memorandum, (Chase's Resp. Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. at 12-17, June 21, 2012, Docket No. 70), the TIL signed by the Ebbighausens actually understated the amount financed and thus overstated the finance charge. "If a lender understates the amount financed, it effectively overstates the finance charge . . . ." *Peterson v. Spectra Fin., Inc.*, Civil No. 06-3796, 2007 WL 967334, at *3 (D. Minn. Mar. 29, 2007); *see also VanDenBroeck v. Commonpoint Mortg. Co.*, 22 F. Supp. 2d 677, 687-88 (W.D. Mich. 1998); *Strong v. Option One Mortg. Corp.* (*In re Strong*), 356 B.R. 121, 167 n.40 (Bankr. E.D. Pa. 2004).  There is no right to rescission under TILA where the lender understates the amount financed and thereby overstates the finance charge.  *Peterson*, 2007 WL 967334, at *3.

underdisclosed the finance charge by more than $35." (*Id.*)  As noted above, the amount of "total settlement charges" changed from $10,882.14 in the first HUD-1 to $17,764.64 in the second HUD-1, which the Ebbighausens allege violates TILA.  The primary reason for this difference in settlement costs was the first HUD-1's failure to list a loan discount fee of $6,641.25.

### 1.      Ability of HUD-1s to Violate TILA

To address the Ebbighausens' argument, the Court must decide if inaccuracies in a HUD-1 can violate TILA.  HUD-1s are created pursuant to the Real Estate Settlement Procedures Act ("RESPA").  RESPA mandates that a HUD-1 settlement statement "shall be completed and made available for inspection by the borrower at or before settlement by the person conducting the settlement."  12 U.S.C. § 2603(b); *see also* 24 C.F.R. § 3500.10.

The Court must first look to the language of TILA to determine if it requires accuracy in HUD-1s.  *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 862 (8th Cir. 2011) ("[W]ith any question of statutory interpretation, the court begins its analysis with the plain language of the statute[.]").  TILA itself appears to be silent on whether HUD-1s must contain accurate terms at the time of closing.  On the one hand, TILA states generally that, before the consummation of the transaction, "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep."  12 C.F.R. § 226.17(a)-(b).  TILA does not explicitly exclude the possibility that HUD-1s are among the "disclosures" that must

include correct material terms.   On the other hand, TILA's model disclosure forms (which include TILs, for example) do not include HUD-1s, suggesting that these forms are not subject to TILA's requirements.   *See* 12 C.F.R. Pt. 226, App. H; *see also* 12 C.F.R. § 226.17(a) (outlining form of required disclosures), 226.18 (outlining content of required disclosures).

Because TILA is not explicit regarding whether inaccuracies in HUD-1s violate TILA – and, if anything, seems to suggest that they do not – it is appropriate to look to other methods of statutory interpretation.   Under the rule of *in pari materia*, the Court should construe statutes involving related subject matter consistently when possible.   *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972); *Linquist v. Bowen*, 813 F.2d 884, 888-89 (8th Cir. 1987).   Here, RESPA and TILA both involve disclosures related to mortgage loan transactions and thus should be interpreted consistently.   *See Erlenbaugh*, 409 U.S. at 243; *Linquist*, 813 F.2d at 889.

The Court finds – by reading RESPA and TILA together – that violations of RESPA, including inaccuracies in HUD-1s, do not violate TILA.   RESPA states that "[n]othing in [this chapter] shall affect the validity or enforceability of any . . . loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan."   12 U.S.C. § 2615.   Allowing the Ebbighausens to rescind their loan under TILA due to inaccuracies in a HUD-1 would be inconsistent with this explicit provision in RESPA.

Furthermore, RESPA allows for corrections in HUD-1s, which would be inconsistent with requiring accurate HUD-1s under TILA.   RESPA states:

> An inadvertent or technical error in completing the HUD-1 . . . shall not be deemed a violation of . . . RESPA if a revised HUD-1 . . . is provided in accordance with the requirements of this section within 30 calendar days after settlement.

*See* 24 C.F.R. § 3500.8(c).[17]   Thus, RESPA will forgive an inadvertent or technical error that is corrected within thirty days.   TILA, on the other hand, demands that clear and conspicuous disclosures be made **before** consummation of the transaction.   12 C.F.R. § 226.17(a)-(b).   Finding a TILA violation for inaccuracies in HUD-1s provided at closing would therefore conflict with RESPA.   Thus, the Court declines to find a TILA violation due to the inaccuracy in the first HUD-1.

### 2.   Inaccuracy of Terms in the Ebbighausens' HUD-1s

Even if inaccuracies in a HUD-1 violated TILA, however, there would be no violation in this case.   The Ebbighausens argue that TILA was violated because the "settlement costs" on the HUD-1 – which they equate to the "finance charge" under TILA – were inaccurate.   (*See* Am. Compl. ¶ 92.)   However, **the settlement costs listed on the first HUD-1 are not equivalent to a "finance charge" under TILA**; for example, the credit report fee included in the HUD-1's "settlement costs" is not part of

---

[17]   Although this language was added to RESPA on January 16, 2009, after the Ebbighausens' closing, HUD noted in adopting this language that "[t]his opportunity to cure errors on the HUD-1/1A is consistent with **HUD's longstanding policy** permitting settlement agents to provide revised HUD-1/1A settlement statements where errors are discovered after settlement."   73 Fed. Reg. 68204, 68222  (Nov. 17, 2008) (emphasis added).   Thus, the Court finds that RESPA was understood even prior to 2009 to allow revisions to HUD-1s.

the "finance charge" under TILA.[18]  *See* 12 C.F.R. § 226.4(c)(7).  On this basis alone, the

Ebbighausens' claim fails because they have not pled with particularity the inaccurate

terms in the first HUD-1 that violate TILA.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461,

465 (7th Cir. 2010) (holding that pointing to discrepancies between a HUD-1 settlement

statement and TILA disclosures, without demonstrating a specific TILA violation, is

insufficient to state a claim).

In addition, even if the Ebbighausens had pled their claim with specificity, their

TILA claim would fail.  As noted above, the HUD-1 did not list a "finance charge,"

instead listing only "settlement costs" such as the loan discount fee.  The Ebbighausens

therefore cannot claim that the HUD-1 inaccurately disclosed the **overall finance charge**

and can instead only allege that the HUD-1 inaccurately recited aspects of the finance

charge, such as the loan discount fee.  *See* 12 C.F.R. § 226.4(b)(3) (listing "loan fees" as

a component of the finance charge).  However, rescission under TILA is not available for

inaccurate **itemization** of the finance charge.  *See Smith v. Fid. Consumer Disc. Co.*, 898

F.2d 896, 901 (3d Cir. 1990).  Here, the most the Ebbighausens can claim is that the

HUD-1 inaccurately itemized aspects of the finance charge, such as the loan discount fee.

---

[18] Credit reporting and other fees are only excluded from the finance charge if they "are bona fide and reasonable in amount."  12 C.F.R. § 226.4(c)(7); *House v. HSBC Fin. Corp.*, Civ. Action No. 3:11-CV-90, 2011 WL 1883115, at *2 (E.D. Va. May 17, 2011) (stating that credit reporting fees are not normally "finance charges").  The Ebbighausens make no argument that the fees charged did not meet that standard, and the Court finds none, thus these fees are not part of the finance charge.

Because this type of inaccurate itemization does not violate TILA, the Ebbighausens have

not stated a TILA claim.[19]

## B.    Failure to Receive Notices of Right to Cancel

The Ebbighausens also claim that they have the right to rescind their loan under

TILA because they were not given notices of their right to cancel or other closing

documents.  Under TILA, "[i]n a transaction subject to rescission, a creditor shall deliver

two copies of the notice of the right to rescind to each consumer entitled to rescind."  12

C.F.R. § 226.23(b)(1).  The consumer may rescind before midnight of the third business

day following (1) the consummation of the transaction, (2) delivery of the notice of the

right to rescind, or (3) "delivery of all material disclosures, whichever occurs last."  12

C.F.R. § 226.23(a)(3) (footnote omitted).  Written acknowledgement of receipt of any

disclosures creates a rebuttable presumption of proper delivery of the disclosures. 15

U.S.C. § 1635(c).  The burden is then on the debtors to rebut the presumption by

---

[19] The Ebbighausens also argue, without citing to applicable authority, that there is a TILA violation because the wrong "closing" date is included on the disclosures they signed. Specifically, the Ebbighausens argue that the closing in fact took place on July 28, not 26; as support, they point to the settlement date listed on the second HUD-1 and the fact that the lost note affidavit listed a closing date of July 28.  This argument rests on the premise that the second HUD-1 defined the terms of the transaction and thus the loan did not close until its creation. Even assuming that including the wrong closing date on the TIL or other closing documents constitutes a TILA violation, the Ebbighausens have not shown such a violation here.  The Ebbighausens never define the term "closing."   HUD regulations state that a real estate "settlement" is "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan.  This process may also be called 'closing' or 'escrow' in different jurisdictions."   24 C.F.R. § 3500.2(b).   RESPA states that settlement statements can be revised **after** the "settlement" or "closing."  *Id.* § 3500.8(c).  Thus, the Court finds no merit in the argument that the revision of the HUD-1 created a new "settlement" or "closing" date and finds that the closing was, in fact, on July 26.

presenting evidence that the requisite number or quality of disclosures were not received. *Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50, 64 (D.D.C. 2002).

Here, there is no dispute that the Ebbighausens ultimately received the closing documents they signed, including the TIL and the notice of right to cancel.  (*See, e.g.*, First Ebbighausen Aff., Ex. E.)[20]  The dispute is over the timing of this receipt.  The Ebbighausens allege that "Washington Mutual did not provide any Notices of Right to Cancel to the Ebbighausens on either of the closing dates specified on the HUD-1 settlement statements: July 26, 2007 or July 28, 2007."  (Am. Compl. ¶ 90.)  The complaint also alleges that TILA was violated because the Ebbighausens "did not receive a copy of any TILA disclosures on July 28, 2007, which is the date of the closing according to the [second] HUD-1."  (*Id.* ¶ 91.)  These allegations, even if true, do not violate TILA because TILA explicitly does not require that the notice of right to cancel be provided on the date of the closing.  *See Simmons v. Mortg. Elec. Registration Sys., Inc.*, Civil No. 09-162, 2010 WL 428784, at *3 (D. Minn. Feb. 2, 2010); *Peterson v. Argent Mortg. Co.*, Civil No. 06-3796, 2007 WL 1725355, at *2 (D. Minn. June 14, 2007).  Rather, TILA gives the consumer three days after the delivery of the notice of right to cancel to rescind the transaction.  *See* 12 C.F.R. § 226.23(a)(3).  Thus, by

---

[20] To the extent that the Ebbighausens might now claim that there is a dispute as to whether they **ever** received the closing documents, the Court finds that this allegation was not pled with specificity and is unsupported by the record.  (*See* First Ebbighausen Aff., Ex. E.) Indeed, at oral argument, the Ebbighausens admitted that they received copies of closing documents.

alleging that they have the right to rescind because the HUD-1 was not delivered on the date of closing, the Ebbighausens have failed to state a TILA claim.[21]

## III.   QUIET TITLE

Next, the Court must address the quiet title claim that the Ebbighausens bring against Chase and the FDIC as receiver.   The quiet title claim rests on allegations that Chase does not possess the note and there are defects with the note.   (Am. Compl. ¶¶ 100-03.)   The Court will dismiss this claim because these allegations are meritless under Minnesota law.[22]

Under Minnesota law, an assignment of mortgage must be recorded prior to foreclosure of a mortgage by advertisement.   Minn. Stat. §§ 580.02, .04; *Jackson v.*

---

[21] The Ebbighausens may have been able to demonstrate that the notice of right to cancel was **defective** because it was delivered on a date other than July 26 and thus included the wrong cancellation date.   TILA disclosures must include the date the rescission period expires.   12 C.F.R. § 226.23(b)(1)(v).   If the proper rescission date is not included on the notice of right to cancel, the borrower has the right to rescind the loan.   *See Balderas v. Countrywide Bank, N.A.*, 664 F.3d 787, 791 (9th Cir. 2011) (holding that notice that provides the wrong rescission date violates TILA).   In addition, the notice of right to cancel may have been defective because it only stated that the transaction should be cancelled within three business days of July 26, 2007, but did not include the precise date through which cancellation should occur, presumably July 29, 2007.   *See Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 703-05 (9th Cir. 1986); *Peterson-Price v. U.S. Bank Nat'l Ass'n*, Civil No. 09-495, 2010 WL 1782188, at *6-8 (D. Minn. May 4, 2010).   However, the Ebbighausens did not plead that the notice included the wrong cancellation date, nor did they make this argument in their briefing.   Accordingly, the Court will not address these issues.

[22] The Ebbighausens also argue that the mortgage is invalid because of problems with the HUD-1s.   As noted above, even if there had been a violation of RESPA because of problems with the HUD-1s, this violation would not void the note or the mortgage.   *See* 12 U.S.C. § 2615 ("Nothing in [RESPA] shall affect the validity or enforceability of any . . . loan, loan agreement, mortgage, or lien made or arising in connection with a federally related mortgage loan."); *see also, e.g.*, *Webster Bank v. Linsley*, No. CV970260406S, 2001 WL 1042581, at *5 (Conn. Super. Ct. Aug. 14, 2001).

*Mortg. Elec. Registration Sys., Inc.*, 770 N.W.2d 487, 494 (Minn. 2009).  The law of this Circuit clearly establishes that different entities can hold the promissory note and legal title to the mortgage, and that the holder of legal title to a mortgage need not possess the promissory note before it can institute foreclosure by advertisement.  *Stein v. Chase Home Fin., LLC*, 662 F.3d 976, 979-80 (8th Cir. 2011) (citing *Jackson*, 770 N.W.2d at 489-501).

As a preliminary matter, the Court notes that it is not at all clear that Chase has properly instituted foreclosure proceedings against the Ebbighausens.  Chase has not demonstrated that it has properly recorded the Chase mortgage, which is a prerequisite to any foreclosure proceeding instituted by Chase as mortgagee.  *See Jackson*, 770 N.W.2d at 494.  However, this is not the focus of the Ebbighausens' claims.  Instead, the Ebbighausens focus on problems with the note.

Specifically, the Ebbighausens argue that the cases controlling on this Court – *Jackson* and *Stein* – were in error because they are silent on the role of Article 3 of the UCC in the enforcement of promissory notes.  According to the Ebbighausens, Article 3 of the UCC does not allow the mortgage and note to be transferred separately and thus Chase must prove it is the owner of the note.  The Court rejects this argument as a repackaging of the discredited show-me-the-note arguments repeatedly disallowed by this Court.  *See Butler v. Bank of America, N.A.*, 690 F.3d 959, 962 (8th Cir. 2012) (holding that the show-me-the note argument "is foreclosed by the plain language of Minnesota's foreclosure-by-advertisement statute").

The Ebbighausens also appear to argue that Chase does not have the authority to foreclose because it did not demonstrate its authority to foreclose on behalf of the note holder.   The Court finds no merit in this argument.   "[I]t is not necessary that the mortgage holder get the permission of the note holder to foreclose; if the mortgage holder forecloses against the wishes of the note holder, that is a dispute for those parties (and only those parties) to resolve."   *Welk v. GMAC Mortg., LLC*, 850 F. Supp. 2d 976, 985(D. Minn. 2012); *see also JPMorgan Chase Bank, N.A. v. Erlandson*, No. A12-0045, 2012 WL 3792624, at *5 (Minn. Ct. App. Sept. 4, 2012).[23]   In addition, even if Chase was required to prove that it owned the note, the Court finds that it could do so.[24]

---

[23] *See also Jackson*, 770 N.W.2d at 501 (concluding that "any disputes that arise between the mortgagee holding legal title and the assignee of the promissory note holding equitable title do not affect the status of the mortgagor for purposes of foreclosure by advertisement" and that "the legal title holder of the security instrument holds the security instrument in trust for those with equitable interests"); *Bottineau v. Aetna Life Ins. Co.*, 16 N.W. 849, 850 (Minn. 1883) ("The mortgagor, whose interests were not affected by the fact that others had equitable rights in the mortgage with the one in whom the legal title was vested, could not on that fact alone object to his using such legal title."); *Stein*, 662 F.3d at 980 ("Chase was the party entitled to commence a foreclosure by advertisement under Minnesota law, even if the promissory note (and the corresponding equitable interest in the mortgage) had been transferred to someone else."); *Robinson v. Bank of Am., N.A.*, Civil No. 11-2284, 2012 WL 2885128, at *9 n.11 (D. Minn. May 31, 2012) (arguments that a bank "is not entitled to enforce the note [are] just as frivolous as any other claim that is premised on the show-me-the-note theory" (citation omitted) (internal quotation marks omitted)), *report and recommendation adopted*, 2012 WL 2885477 (D. Minn. July 13, 2012); *Murphy v. Aurora Loan Servs., LLC*, Civil No. 11-2750, 2012 WL 104543, at *3 (D. Minn. Jan. 12, 2012) ("Plaintiffs also misread *Jackson* as standing for the proposition that the mortgage holder needs more than just the recorded mortgage document or assignment to have the right to foreclose under Minnesota law.   This is simply not true." (citation omitted) (internal quotation marks omitted)).

[24] The Ebbighausens argue that there is a question of fact regarding whether the lost note agreement and indemnity was transferred to a party other than Chase.   The Court disagrees.   The lost note agreement and indemnity does not raise a question of material fact about ownership because it appears to be a stock document created by WaMu and there is no evidence that the

(Footnote continued on next page.)

The Ebbighausens also argue that there is a defect with the affidavit of lost note, creating no right to foreclose on the property. The Court finds otherwise. Minnesota Statutes § 336.3-309(b) requires that a person seeking to enforce an instrument "prove the terms of the instrument and the person's right to enforce the instrument." Here, Chase has proven the terms and its right to enforce the note. First, a copy of the note is attached to the amended complaint, showing its terms. Second, the original affidavit of lost note is in the possession of Chase and establishes, along with the P&A agreement, that the Ebbighausens' note was transferred to Chase.[25] Thus, there is no question of material fact regarding the terms and ownership of the instrument. Because the Ebbighausens' quiet title claim is based on alleged problems with the note, the Court will dismiss the claim.

_____

(Footnote continued.)

loan was, in fact, assigned to anyone other than Chase. The fact that the Ebbighausens have not been contacted by anyone for payment nor have made payments to anyone other than WaMu and Chase supports that no other entity was assigned the Ebbighausens' loan. Furthermore, Chase has submitted a declaration establishing that it is in possession of the original affidavit of lost note, and the Ebbighausens have produced no evidence to the contrary. (*See* McGruder Decl. ¶¶ 6-7.) Accordingly, the Court finds no evidence to support the proposition that a party other than Chase was assigned the note.

[25] Although there is an error as to the date on the affidavit of lost note, the Court finds that this is insufficient to raise a question about the affidavit's authenticity, particularly because the correct date is noted on the corresponding lost note agreement and indemnity and because the affidavit of lost note refers to the loan number of the original note.

## IV.    FRAUD / INTENTIONAL MISREPRESENTATION AGAINST CHASE AND THE FDIC

The Ebbighausens next allege fraud and misrepresentation against Chase and the FDIC as receiver for WaMu.  This claim is based on allegations that WaMu included incorrect terms on the first HUD-1 on which the Ebbighausens relied when entering into the mortgage loan transaction.

In an action for fraudulent misrepresentation, the plaintiff must show that the misrepresenter acted with fraudulent intent.  *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986).  "Fraudulent intent is, in essence, dishonesty or bad faith."  *Id.*

> [A] misrepresentation is made with fraudulent intent if the maker:
> (a)  knows or believes that the matter is not as he represents it to be,
> (b)  does not have the confidence in the accuracy of his representation that he states or implies, or
> (c)  knows that he does not have the basis for his representation that he states or implies.

*Id.* (quoting Restatement (Second) of Torts § 526 (1977)).

The Court concludes that no reasonable jury could conclude that WaMu or the closer, Anderson, acted with fraudulent intent.  Here, there is no direct evidence that WaMu or Anderson acted in anything but a negligent manner in making errors on the first HUD-1.  The circumstantial evidence likewise yields no reasonable inference of fraudulent intent.  Documents at closing other than the HUD-1 that contained correct terms, including the loan discount fee, suggesting a lack of intent to deceive.  Furthermore, the HUD-1 was revised – in accordance with REPSA and shortly after the closing – to disclose the correct terms, again suggesting that Anderson and WaMu had no

intent to mislead the Ebbighausens.[26]   Absent any evidence of dishonesty or bad faith, the Court finds that no jury could reasonably conclude that WaMu had fraudulent intent in producing the first HUD-1 at closing.

In addition to fraudulent intent, the Ebbighausens must also demonstrate that they reasonably relied upon the misrepresentations.   *See Davidson v. Wilson*, 763 F. Supp. 1470, 1472 (D. Minn. 1991).   Reasonable reliance is judged by taking into account "[t]he capacity and experience of the recipient of the alleged misrepresentations."   *Id.*   Matthew Ebbighausen is sophisticated in the area of mortgage loan transactions.   He is a licensed real estate broker who has been involved in hundreds of real estate transactions and has previously seen TILs and HUD-1s.   Given his sophistication and experience, the Court finds that it was unreasonable for him to rely on the first HUD-1 in light of its conflict with other documents signed at closing.   Furthermore, even if the Ebbighausens' reliance could have been reasonable, they have not pointed to evidence showing that they in fact relied on the HUD-1 – to the exclusion of the other documents provided at closing – in deciding to close on the loan.   Accordingly, the Court will dismiss this claim against Chase and the FDIC as receiver for WaMu.

---

[26] In addition, Matthew Ebbighausen – who is sophisticated in mortgage practices – made no complaint that he had been deceived by the first HUD-1 when the HUD-1 was revised or at any other time, until after he fell behind on his mortgage payments.

## V.   FRAUD / INTENTIONAL MISREPRESENTATION AGAINST JOAN BRYANT AND CREATIVE FUNDING CORPORATION, INC.

The Ebbighausens also assert a claim of fraud and intentional misrepresentation against Bryant and Creative Funding Corporation, Inc. ("Creative Funding").  This claim alleges that Bryant and Creative Funding deceived the Ebbighausens into believing they had accepted the terms outlined at closing and misrepresented that the Ebbighausens had agreed to the terms outlined in the second HUD-1.  (Am. Compl. ¶¶ 106-117.)  The Court finds these vague accusations wholly insufficient to survive summary judgment.  The complaint and briefing provide no details on the role that Bryant and Creative Funding played in any aspect of the mortgage loan transaction.  The record is also devoid of specific allegations – much less direct or circumstantial evidence – that would show or even suggest a fraudulent intent on behalf of Bryant and Creative Funding.  *See Florenzano*, 387 N.W.2d at 173.  To the extent that the Ebbighausens attempt to link Bryant and Creative Funding's liability to that of Chase or WaMu, this attempt fails for the reasons listed above regarding the fraud claim against those defendants.[27] Accordingly, the Court will dismiss this claim.

---

[27] The Ebbighausens ask for a default judgment against Bryant and Creative Funding due to their failure to appear in this action.  "When co-defendants are similarly situated, inconsistent judgments will result if one defendant defends and prevails on the merits and the other suffers a default judgment.  To avoid such inconsistent results, a judgment on the merits for the answering party should accrue to the benefit of the defaulting party."  *Angelo Iafrate Constr., LLC v. Potashnick Constr., Inc.*, 370 F.3d 715, 722 (8th Cir. 2004) (citations omitted).  The Court finds that Bryant and Creative Funding are similarly situated to Chase and the FDIC because their liability is based on overlapping legal theories and alleged wrongful acts.  *See id.*  Accordingly, the Court finds that a default judgment against Bryant and Creative Funding would render inconsistent verdicts and is therefore inappropriate.

## VI.    CIVIL CONSPIRACY TO COMMIT FRAUD

The Ebbighausens bring a civil conspiracy to commit fraud claim against Chase, the FDIC as receiver for WaMu, Creative Funding and Bryant.  This claim fails for two reasons.  First, under Minnesota law, "[a] civil conspiracy claim requires an underlying tort."  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986-87 (8th Cir. 2008).  As already explained, the Court will dismiss the Ebbighausens' fraud claims so they have no underlying tort to support a claim for civil conspiracy to commit fraud.  Second, the Ebbighausens' allegations regarding civil conspiracy are nebulous and insufficient to state a claim in any event.  *See* Fed. R. Civ. P. 12(b)(6), 9(b).  They allege that WaMu, Creative Funding, Bryant, and Chase combined unlawfully to originate and enforce a mortgage loan other than the loan to which the Ebbighausens agreed, unlawfully enforced a security instrument not incident to any lawful debt instrument, and executed and exchanged false documents, among other allegations.   (Am. Compl. ¶¶ 134-41.) However, nowhere do the Ebbighausens explain what role Creative Funding and Bryant had in the creation or signing of the mortgage loans; instead, they make general allegations, such as that they "exchanged false documents" and "perpetrate[d] a fraud." (*See id.* ¶¶ 135-36.)   The Ebbighausens also fail to explain how the parties worked together, beyond vague accusations that they "confederated and combined" to participate in various activities.  (*See id.* ¶ 139.)  Accordingly, dismissal of this claim is warranted.

## VII.   NEGLIGENT MISREPRESENTATION

The Ebbighausens also assert a claim of negligent misrepresentation against Chase, the FDIC as receiver for WaMu, Creative Funding, and Bryant.  In order to prevail on a negligent misrepresentation claim, the Ebbighausens must demonstrate: "(1) a duty of reasonable care in conveying information; (2) breach of that duty by negligently giving false information; (3) reasonable reliance on the misrepresentations, which reliance is the proximate cause of physical injury; and (4) damages." *Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 350-51 (Minn. Ct. App. 2001).

This claim alleges that the defendants misrepresented that the Ebbighausens entered into a mortgage loan agreement with settlement charges as reflected in the first HUD-1.[28]   (Am. Compl. ¶ 143.)   This allegation fails because, as described above, the Ebbighausens did not reasonably rely on the HUD-1 in entering into the mortgage transaction, nor have they raised a question of fact regarding whether they in fact relied on the HUD-1.[29]

---

[28] The complaint actually alleges that the misrepresentation was that the final terms were consistent with the **second** HUD-1 statement – but this appears to be an error.

[29] The Court will also dismiss this claim as to Bryant and Creative Funding because the Ebbighausens have not properly alleged that these defendants owed them a duty of care.  The Minnesota Supreme Court has recognized a duty of care in the context of certain legal relationships.  *See Williams v. Smith*, Nos. A10-1802, A11-0567, 2012 WL 3192812, at *8 (Minn. Aug. 8, 2012).  Here, the Ebbighausens have not only failed to allege a legal relationship between Bryant and Creative Funding and themselves; they have failed to specifically allege the existence of **any** relationship.  Accordingly, the Court will dismiss this claim against Bryant and Creative Funding.

In addition, the negligent misrepresentation claim alleges problems with the note and the giving of false information to the Ebbighausens about the enforceability of the note and Chase's right to foreclose.[30]   The Court will dismiss this claim because, as explained above, the Ebbighausens have not raised a genuine issue of material fact regarding problems with the note or with Chase's attempt to foreclose based on the note.[31]

---

[30] As noted above, it is possible that Chase does not have the right to foreclose because of improper recording of the mortgage.  The negligent misrepresentation claim comes the closest to alleging that Chase did not have the right to foreclose under the mortgage, but the Court nonetheless finds that the complaint does not make this allegation with sufficient specificity. The complaint states that there was a misrepresentation about the "existence" of the mortgage and that "[i]n executing the documents to avail themselves of the foreclosure by advertisement statute, Defendant Chase misrepresented that it had the power and the right to foreclose on the Ebbighausen home."  (Am. Compl. ¶¶ 143-44.)  The Court finds that this allegation does not claim with specificity that the Ebbighausens' mortgage was insufficiently recorded. Furthermore, the claim alleges that defendants "have enforced terms under a note that the Ebbighausens never agreed to and are not bound by, **which is the cause of damages to Plaintiffs**."  (*Id.* ¶ 148.) (emphasis added).  Again, this statement shows that the focus of the Ebbighausens' negligent misrepresentation claim is alleged problems with the note, not the recording of the mortgage.  In addition, the claim fails because it alleges that a plaintiff in another case, "Peterson-Price," is entitled to damages – not the Ebbighausens.  (*Id.* ¶ 150.)  It also mentions a defendant not named in this case, "Trimark."  (*Id.* ¶ 146.)  For all of these reasons, the Ebbighausens have failed to state a claim for negligent misrepresentation claim against Chase.

[31] The Ebbighausens also bring a claim, Count IX, against Creative Funding and Bryant entitled "individual liability / piercing the corporate veil."  (Am. Compl. ¶¶ 165-69.)  This claim alleges that Bryant "has used Creative Funding Corporation's corporate form to perpetuate a fraud on the Ebbighausens" and that Bryant "is liable to Plaintiffs for all of the damages and relief sought in all counts above."  (*Id.* ¶¶ 165, 169.)  The Court will dismiss this claim because it is contingent upon the other claims against Bryant and Creative Funding that, for the reasons already described, the Court will dismiss.

## VIII.  SLANDER OF TITLE

The Ebbighausens assert a slander of title claim against Chase and the FDIC as receiver for WaMu.  Under Minnesota law, slander of title requires a plaintiff to establish that (1) a false statement (2) was published to others (3) maliciously[32] and (4) the publication caused the plaintiff pecuniary loss in the form of special damages.  *Paidar v. Hughes*, 615 N.W.2d 276, 279-80 (Minn. 2000).  The Ebbighausens allege that Chase made a false statement about the property by "record[ing] a mortgage incident to a nonexistent loan and record[ing] that mortgage with the Scott County Office of the Registrar of Titles."[33]  (Am. Compl. ¶ 154.)  They also assert that "the notice of pendency of foreclosure was publicly recorded even though it was not valid and in disregard to the facts."  (*Id.* ¶ 155.)  Again, the Court finds no genuine issue of material fact regarding whether there is a nonexistent loan or a false statement about a nonexistent loan; therefore, the Court will dismiss this claim.[34]

----

[32] A malicious statement is a "groundless disparagement of the plaintiff's title or property . . . made without probable cause."  *Quevli Farms, Inc. v. Union Sav. Bank & Trust Co.*, 226 N.W. 191, 192 (Minn. 1929).

[33] The Court notes that the Ebbighausens affirmatively allege with this claim that Chase **recorded the mortgage**.  Thus, clearly the complaint cannot be read to allege that the mortgage was not recorded.

[34] The FDIC moved for summary judgment on the grounds that the Ebbighausens failed to comply with the procedural requirements of 12 U.S.C. § 1821(d), depriving this Court of subject matter jurisdiction to hear the Ebbighausens' claims against the FDIC.  The Court acknowledges that it would normally address this jurisdictional issue prior to reaching the merits.  However, because all of the claims against the FDIC are also brought against other parties, and because the Court has dismissed all of the claims on the merits, the Court need not reach this issue.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant JP Morgan Chase Bank, N.A.'s Motion for Summary Judgment [Docket No. 46] is **GRANTED**;

2.     Defendant Federal Deposit Insurance Corporation's Motion for Summary Judgment [Docket No. 59] is **GRANTED**;

3.     Plaintiffs' Motion for Default Judgment and Motion for Summary Judgment [Docket No. 62] is **DENIED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:   January 3, 2013                          ___s/ John N. Tunheim___
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                  United States District Judge